**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-01797-MJW

A.J. & ANDREA FOWLER

      Plaintiffs,

      v.

BANK OF AMERICA BANK CORPORATION, BANK OF AMERICA, N.A., BAC
HOME LOANS SERVICING, L.P. f/k/a COUNTRYWIDE HOME LOANS INC.

      Defendants.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS**

---

The Plaintiffs, Albert and Andrea Fowler, by their undersigned attorney, respond
to Defendant's Motion to Dismiss as follows:

## I.      BACKGROUND

This is a civil action jointly filed by the Plaintiff's against the Defendants for mis-
conduct related to servicing the Plaintiff's single-family mortgage. The Defendant's
misconduct is proscribed by the Real Estate Settlement Procedures Act "RESPA," 12
U.S.C. 2601 et. seq., the Truth in Lending Act, 15 U.S.C. 1640 et.seq., Colorado statutes
C.R.S. § 38-40-101 et. seq. and 6-1-101 et. seq. and common law. Plaintiff's claims
largely concern that certain property which street address is: 8725 Soapweed Road,
Calhan, CO 80808 ('Property'). This is Plaintiff's family home.

The Defendants own and/or service or have owned and/or serviced [as this term is
defined by 12 U.S.C. 2605(i)(3)] the home mortgage and loan/note securing the Property.

Between 9/12 and 3/15, Plaintiffs fell behind in their loan and became the subject of multiple foreclosure actions initiated by the Defendants. During that time, Plaintiffs submitted 13 Home Affordable Modification Program ('HAMP' – loan modification) applications, each of which required extensive written follow-up. From May of 2012 to the present, Plaintiffs sent Defendants 867 qualified written requests ('QWR's) notices of error ('NOE's) and/or requests for information ('RFI's). (Exhibits 01-2025 through 50-SHON-06 #3). Each correspondence contained a unique reference number which Plaintiff's requested Defendants to reference in its return the correspondence for tracking purposes.

## II.    STANDARD OF REVIEW

A court may dismiss a complaint for " failure to state a claim upon which relief can be granted." See FED.R.CIV.P. 12(b)(6). In deciding a motion under Rule 12(b)(6), this Court must: "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). To withstand a motion to dismiss, a complaint must contain enough allegations of fact " to state a claim to relief that is plausible on its face." Id. As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." "The burden is on the plaintiff to frame 'a complaint with

enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The purpose of the pleading requirement is two-fold: " to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense, and to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (citation and internal quotation marks omitted). The ultimate duty of this Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Generally, a court considers only the contents of the complaint when ruling on a Rule 12(b)(6) motion. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Exceptions to this general rule include: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes their authenticity; and "matters of which a court may take judicial notice." Id. (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

III.     PLAINTIFF'S RESPONSES

**<u>Defendant's  arguments found in its "INTRODUCTION" (pages 2 & 3)</u>**

- *"[The Fowlers do not] identify a single alleged error committed in the actual servicing of their loan…."*

- *The Fowlers admit mailing most of their "mailings" to the wrong address and/or were duplicative of letters previously sent.*

- *BANA clearly complied with all applicable legal obligations….*

- *"…BAC is not an appropriate party*

- *"… [T]heir inquiries did not constitute 'qualified written requests';*

- *"BANA [Bank of America North America] fulfilled its obligations with respect to any mailings that did qualify [Under RESPA];"*

- *"[T]he Fowlers fail to allege a right to actual or statutory damages [under RESPA]."*

- *"… [T]he Fowlers' Truth in Lending Act ("TILA") claim is untimely because it accrued outside the applicable one-year statute of limitations.*

- *"… [T]he Fowlers have failed to allege a violation of Colo. Rev. Stat. § 38-40-103 because they have not pled the necessary elements of the claim or resulting damages. "*

- *[The Fowlers' claim of fraudulent inducement is] predicated on a misinterpretation of a May 2012 conditional offer for relocation assistance; subject to the Credit Agreement for the Statute of Frauds; "*

- *[The Fowlers' claim of fraudulent inducement] fails to allege the required elements of a fraudulent inducement claim."*

- *[The Fowlers' claim of fraudulent inducement is] fails to meet the public impact requirement of a Colorado Consumer Protection Act ('CCPA') claim."*

- *"[T]he Fowlers fail to allege conduct by BANA that is extreme and outrageous as a matter of law."*

**Plaintiff's Response**

Remedies available under RESPA are not limited to 'identification of errors' committed in the servicing of mortgage loans. A RESPA written enquiry can dispute a servicer action, ask a question related to the servicing of a loan and/or seek information.[1] The Fowlers written enquiries included 'Qualified Written Requests' and 'Requests for Information' as allowed under the law. See Complaint ¶ 26 and Exhibits (Exhibits 01-2025 through 50-SHON-06 #3).

The Fowlers do not admit, and the pleadings do not demonstrate that most of their mailings "were mailed to the wrong address." Much of the initial correspondence, which was mailed to non-designated addresses, was duplicated and sent to the addresses designated by the Defendants. When it was ignored by the Defendants, it was re-sent a third time.[2]

¶ 35 of Plaintiff's Complaint reads:

Initially, Plaintiffs sent their QWR's to addresses not designated for receipt of QWR's. Upon becoming aware of specific addresses designated for receipt of QWR's, NOE's and 'RFI's, Plaintiffs copied and re-sent the same correspondence to addresses designated by BOA or its

---

[1] See *Amini v. Bank of America*, 2012 WL398636 (W.D. Wash. Feb 7, 2012); *Luciw v. Bank of America*, 2010 WL 3958715 (N.D.Cal. Oct 7, 2010)(statute is drafted in the disjunctive so that the request for account information alone, without statement that account is in error, is a valid qualified written request); *Goldman v. Aurora Loan Services, L.L.C.*, 2010 WL 3842308 (N.D. Ga. Sept 24, 2010 (same); *In re Julien*, 488 B.R. 502, 508 (Bankr.D.Mass.2013)("unnecessary for a debtor who mailed a detailed request for information to couple these requests with specific assertions of error").

[2] RESPA mandates that a bank/servicer MUST acknowledge receipt of a borrower's written correspondence within 5 days and MUST provide a substantive response within 30 days, although the bank/servicer may request a 15 day extension if such a request is made within the 30 day period and the borrower is notified of the extension and reasons for the delay in responding. *See* 12 U.S.C. 2605(e)

agents for receipt of this type of correspondence. (Exhibits 01-2025 #2 through 50-SHON-06 #2).

¶ 36 of Plaintiff's Complaint reads:

When BOA did not respond, Plaintiff re-sent these QWR's, NOE's & RFI's a *third* time to the addresses designated by the Defendant's for receipt of this type of correspondence. The Defendants designated the following addresses:

> Bank of America, N.A.
> Customer Service Correspondence
> CA6-919-01-41
> P.O. Box 5170
> Simi Valley, CA 93062-5170
>
> Bank of America, N.A.
> P.O. Box 942019
> Simi Valley, CA 93094-2019
>
> The Castle Law Group. L.L.C.
> 999 18th Street, Suite 2201
> Denver, CO 80202
>
> Bank of America, N.A.
> Attn: Notice of Error & Request for Information
> P.O. Box 942019
> Simi Valley, CA 93094-2019

(supported by Exhibits C17, C71, C114 and C174).

Written notice from the Defendants designated the foregoing addresses for receipt of 'requests for Information' '(RFI's), qualified written requests ('QWR's) and 'notices of error' ('NOE's) to which the Fowlers sent their correspondence at least twice.[3]

---

[3] But see *Benner v. Bank of America*, 917 F.Supp.2d 338 (E.D.Pa. 2013)("…[N]owhere in the plain language of 12 U.S.C. §2605(e) or 24 C.F.R. § 3500.21(e)(1), is a borrower required to send his requests to a loan servicer's specified address; the law simply allows a servicer to establish such a place").

Defendants did *not* comply with *any* of the applicable legal obligations in that there was no timely acknowledgement of receipt of the Fowlers correspondence[4] nor was there ever a timely and substantive response[5] to *any* of the Fowlers letters with a single exception.

¶ 32 of Plaintiff's Complaint reads:

> In the course of its conduct, management and oversight of servicing Plaintiff's loan, the Defendants failed to respond or failed to timely respond to all but one of Plaintiff's

---

[4] 12 U.S.C. 2605(e)(1)(A) reads:

"If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period."

[5] 12 U.S.C. 2605(e)(2) reads:

"Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall-

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes-

(I) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(II) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes-

(I) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

(II) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

QWR's', NOE,'s and RFI's under:

> a)    the earlier version of RESPA which required the bank/servicer to acknowledge receipt of a consumers QWR's within 20 days of receipt followed by a substantive response after 60 days, and;
>
> b)    the current version of RESPA which requires a bank/servicer to acknowledge receipt of a consumers QWR, NOE and/or RFI within 5 days of receipt followed by a substantive response after 30 days.

¶ 33 of Plaintiff's Complaint reads:

> Only one response mentioned Plaintiff's correspondence unique reference tracking number, acknowledged Plaintiff's inquiry within 5 days, and; provided a substantive response within 30 days (Exhibit 39-DTFC-03).

RESPA changed 1/10/14. After January 10, 2014, the Fowlers' correspondence to the Defendant's could, and did, include NOE's and RFI's. Under the pre 10/14/14 law, qualifying conditions for treatment of the Fowlers' communications as QWR's were also met.[6] To qualify under the earlier version of RESPA, a borrower's request needed be to

---

[6] *Jeffries v. Dutton & Dutton, P.C.*, 2006 WL 1343629 (N.D. Ill. May 11, 2006); *Wright v. Litton Loan Servicing, L.P.*, 2006 WL891030 (E.D.Pa. Apr 4, 2006)(QWR not required to contain name and account number, only information sufficient to identify the account); *Vician v. Wells Fargo Home Mortgage*, 2006 WL 694740 (N.D.Ind. Mar. 16, 2006); *McDonald v. Wash. Mut. Bank*, 2000 U.S. Dist. LEXIS 11496 (N.D.Ill. June 26, 2000)("Sec. 2605(e)(1)(B) does not require much for a correspondence to constitute a

the 'servicer' of the loan.[7] The Defendants are both 'servicers'[8] and 'holders' (or at least claim to be). The inquiries needed to be in the form of written correspondence.[9] All of the Fowler's queries were written correspondence.

QWR's need to contain the borrowers' name and account number or provide sufficient information to enable the servicer to identify the borrowers name and account.[10] Each of the Fowlers correspondence satisfied this requirement. Finally, a written inquiry was required to be treated as a QWR if it: 1) included the "reasons for the belief of the borrower, to the extent applicable, that the account is in error" or; 2) provided sufficient detail to the servicer regarding other information sought by the borrower.[11] Under the old law, Plaintiff's communications to BOA met all statutory requirements of QWR's.[12] See Complaint Exhibits 01-2025 through 50-SHON-06 #3.

Many of the Fowler's written enquiries related to the status of their 13 HAMP

---

qualified written request"); *Cortez v. Keystone Bank*, 2000 U.S. Dist. LEXIS 5705 (E.D.Pa. May 2, 2000); *Rawlings v. Dovenmuehle Mortgage, Inc*., 64 F.Supp.2d 1156 (M.D. Ala. 1999).

[7] 12 U.S.C. 2605(e). *In re Madera*, 363 B.R. 718 (Bankr.E.D.Pa. 2007) aff'd on other grounds at 388 B.R.586 (E.D.Pa. 2008).

[8] Definition of 'Servicer' at 12 U.S.C. Sec. 2605(i)(2).

[9] 12 U.S.C. Sec. 2605(e)(1)(B); Reg. 'X,' 24 C.F.R. Sec. 3500.21(a),(e)(2); *Hunter v. Wash. Mut. Bank*, WL 4206604 (E.D.Tenn.Sept.10, 2008)(fax sent by homeowner listing his name, account number and the reasons he believed servicer was in error may be a QWR).

[10] 12 U.S.C. Sec. 2605(e)(1)(B)(i); Reg. 'X,' 12 C.F.R. S § 1024.21(e)(2).

[11] 12 U.S.C. Sec. 2605(e)(1)(B)(i); Reg. 'X, 12 C.F.R. S § 1024.21(e)(2). See *Lee v. Equifirst Corp*.. 2010 WL 4320714 (M.D. Tenn. Oct. 26, 2010)(rejecting servicer argument that letter was not QWR based on failure to include name and account number, noting that borrower obviously included sufficient identifying information because servicer actually responded to the letter).

[12] See Catalan v. GMAC Mortg. Corp., 629 F.3d 676, 686 – 687 (7th Cir. 2011)("A Plaintiff's correspondence with a loan servicer does not need to include "magic language" in order to trigger RESPA's requirements").

loan modification applications, not just their existing loan, and were also QWR's.[13]

The Fowler's HAMP related inquiries qualified under RESPA because the only method of obtaining a HAMP modification based upon the design of the program is through a participating servicer like the Defendants. Congress stated that the loan modification analysis required by HAMP is the standard of the residential mortgage servicing industry under both Federal and State law.[14]

BAC is an appropriate party to this action because it was the servicer of the Fowler's loan. See Complaint ¶ 7 and And Complaint Exhibits B: 10, 12, 14-16, 20, 24-26, 29-30, 33-34, 37-38, 41-42, 45-46, 52-54, 56-58, 60-62, 64-66, 68, 70, 72, 77-78, 80-82, 85-86, 92, 95-96, 99-100, 103-104, 107-108, 111-112, 115-116, 118-120 referencing BAC as the 'servicer.' RESPA regulates the practices of servicers of the federally related mortgage loans like the Fowler's loan. As such, the servicing requirements under RESPA and its interpreting regulations are imposed on mortgage servicers. The remedy provisions of RESPA do not limit liability to just servicers, but also provide that "[w]hoever fails to comply with any provision" of 12 U.S.C. § 2605 shall be liable to the borrower.[15] Without a limitation in the statute as to the parties who may be liable, application of traditional concepts of vicarious liability[16] also make a parent corporation,

---

[13] *Diamond v. One West Bank*, 2010 WL 1742536 (D.Ariz. Apr. 29, 2010).

[14] *See* 'Helping Families Save Their Homes' Act of 2009, Pub.L.No.111-22, 123 Stat. 1632 (2009)("The qualified loss mitigation plan guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute standard industry practice for purposes of all Federal and State laws").

[15] 12 U.S.C. § 2605(f); 12 C.F.R. § 1024.41(a).

[16] In *Rouleau v. US Bank*, 2015 WL 1757104, at *7 (D.N.H. Apr. 17, 2015), the court held that because RESPA is "a statute that provides a remedy for a defendant's breach of a duty created by and defined in the statute," it creates "'a species of tort liability,'" citing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999). The court in *Rouleau* further noted that the "United States Supreme Court

vicariously liable for the acts of its agent servicer. BAC is the entity identified in the Defendant's correspondence as the servicer and to which the Fowlers were directed to mail their payments. See Complaint Exhibits B: 10, 112, 14-16 , 20, 24-26, 29-30, 33-34, 37-38, 41-42, 52-54, 56-58, 60-62, 64-66, 68, 70, 72, 77-78, 80-82, 85-86, 92, 95-96, 99-100, 103-104, 107-108, 111-112, 115-116 and 118-120. Additionally, the Fowlers have noted and pled the parent corporation's consent to judgment in the "National Mortgage Settlement" wherein it consented to abide by the provisions of RESPA.[17] Pled at Complaint ¶88(f).

Despite Defendants claim that "they fulfilled their obligations with respect to any mailings that did qualify Under RESPA", their claim is unaccompanied by evidence.

The Fowlers allegations of actual and statutory damages under RESPA are found at ¶¶ 17, 19, 37, 38, 40 and 43 of their Complaint. Their actual damages include non-pecuniary emotional distress damages.[18] These are pled at Complaint ¶¶ 91 – 109 and documented in the 'nightmare' notes in Complaint Exhibits TZ2, TZ3, TZ4 and TZ5. Non-pecuniary damages have been awarded against the Defendants for similar RESPA

---

has long assumed that 'when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules,' and consequently, that its statutorily-created torts 'incorporate those rules,'" citing *Meyer v. Holley*, 537 U.S. 280, 285 (2003).

[17] See case No. 1:12-cv-00361 (U.S. Dist. Ct, D.C., 2012), commonly known as 'The National Mortgage Settlement', (page 41A, §IX, A. 1.: Servicing standards must be incompliance local, state and federal laws and regulations). Signed by Niel A. Cotty, Chief Accounting officer, Bank of America, N.A.

[18] See *Catalan v. GMAC Mortg., Corp.*, 629 F.3d 676, 696 (7th Cir.2011); *McLean v. GMAC Morg. Corp.*, 398 Fed.Appx. 467, 471 (11th Cir.2010) ("Construing the term ' actual damages' broadly, and based on the interpretations of 'actual damages' in other consumer-protection statutes that are remedial in nature, plaintiffs arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA.").

violations.[19]

The Truth in Lending Act ("TILA") claims are timely because, unlike RESPA, TILA has no precise time period or 'trigger event' from which its statute of limitations begins to run following a borrowers request for identification of the owner. Failure to respond to a borrowers requests for identification, address and other relevant contract information about the owner or assignee of a loan is also *specifically* proscribed and sanctioned under 12 U.S.C. §2606(k)(1)(D) which has a three year statute of limitations. *See* 12 U.S.C. § 2614.

Under the old and new law, borrower inquiries seeking identity of the mortgage note holder have been found 'related to the servicing' of their loans and therefore treated as a qualified written requests.[20] The Dodd-Frank Act further clarified that a borrower has the right to request this information under RESPA by adding 12 U.S.C. § 2605(k)(1)(D), requiring a servicer to respond within *ten* business days to a borrower's request for the identity, address, and other relevant contact information about the owner or assignee of a mortgage loan.[21] Such requests are generally subject to the requirements for requests for

---

[19] *Davis v. Bank of America*, No. U.S. Dist. Ct. case no. 2:12-cv-01632-RDP (N.D. Southern Div.), Oct. 9, 2014 ("Construing the term 'actual damages' broadly, and based on the interpretation of 'actual damages' in other consumer-protection statutes that are remedial in nature, plaintiffs arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA."); *Banai v. Sec'y U.S. Dept of Hous. & Urban Dev. Ex rel. Times*, 102 F.3d 1203, 1207 (11th Cir. 1997)(the Fair Housing Act allowance for "actual damages" includes anger embarrassment, and emotional distress); *Akouri v. Fla. Dept. of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005)("… we have held that a plaintiff's testimony alone could support an award of compensatory damages for emotional distress."

[20] See *Selby v. Bank of America, Inc.*, 2011 WL 902182 (S.D. Cal. Mar. 14, 2011) (request for contact information for "Master Servicer" of the obligation and for identity and contact information for the note owner relate to servicing of loan); *Wise v. Wells Fargo Bank*, 850 F. Supp. 2d 1047 (C.D. Cal. 2012); *Davis v. Greenpoint Mortg. Funding, Inc.*, 2011 WL 7070222 (N.D. Ga. Sept. 19, 2011) (holding that an inquiry regarding the identity of the entity on whose behalf the servicer receives payments relates to the servicing of the loan); *Diamond v. One West Bank*, 2010 WL 1742536 (D. Ariz. Apr. 29, 2010); *Woods v. Greenpoint Mortg. Funding, Inc.*, 2010 WL 1729711 (E.D. Cal. Apr. 28, 2010).

[21] 12 U.S.C. § 2605(k)(1)(D), added by Pub. L. No. 111-203, 124 Stat. 1376, tit. XIV, § 1463(a) (July 21, 2010).

information, with modifications to the servicer's response obligations.

Contrary to Defendant's assertions, elements of Colo. Rev. Stat. § 38-40-103 and resulting damages *are* specifically pled at ¶¶ 57 – 73 of Plaintiff's Complaint.

The Fowler's claim of 'fraudulent inducement' is predicated on reasonable interpretation of the Defendant's May 2012 conditional offer for relocation assistance. Complaint Exhibit C46. The issue of 'reasonable interpretation' of this letter should be left to the finder of fact. The letter itself is not subject to the Credit Agreement for the Statute of Frauds because it is not related to credit and was an offer upon which the Fowlers relied. Cases concerning The Statute of Frauds for Credit Agreements ("SFCA") involve borrowers seeking to enforce oral promises to provide financing, forbearance or other financial accommodation. Colorado cases on this point are foot-noted below.[22] The Legislature's intent with the SFCA was to "curtail suits against lenders based on ORAL representations made by members of the credit industry."[23] See also *Schoen v. Morris*, 15

---

[22] *Univex Int'l, Inc. v. Orix Credit Alliance, Inc.*, 914 P.2d 1355 (Colo. 1996). (enforcement of ORAL agreement barred by the Statute). *Hewitt v. Pitkin County Bank and Trust Co.*, 931 P.2d 456 (Colo. App. 1995). (tort claims relating to an ORAL credit agreement in excess of $25,000 barred). *Norwest Bank Lakewood v. GCC Partnership*, 886 P.2d 299 (Colo.App. 1994). (barring tort claims based upon alleged ORAL promise to modify terms of a promissory note); *Lang v. Bank of Durango*, 73 P.3d 1121 (Colo.App. 2003)(barred claims for relief based on ORAL representations made by defendants to the effect that they had verbally agreed to refinance a loan which was subsequently denied). *Premier Farm Credit, PCA v. W-Cattle, LLC*, P.3d 504 (Colo.App. 2006), cert. denied (April 9, 2007). (barred claims relating to enforcement of an ORAL promise to forebear). *Pima Financial Services Corp. v. Selby*, 820 P.2d 1124 (Colo.App. 1991) (ORAL agreement discharging obligations barred).

[23] Representative Kopel, a bill supporter, testified during the House Business Affairs Committee Meeting:

"It's happened in other states and its happened because there is some litigation at a very high level for many millions of dollars where someone has claimed that a statement was made to them by the credit industry, whether finance manager of a bank or whatever, and sometimes courts have used that as a basis for determining yes, there was a contract even though nothing was in writing because other individuals went ahead and relied upon the oral representation."

Recordings of the House Business Affairs Committee on H.B. 11-16-1989, 57th General Assembly (Jan. 19, 1989).

P.3d 1094, 1098-99 (Colo. 2000) citing Recordings of the House Business Affairs Committee on H.B. 11-16-1989, 57th General Assembly (Jan. 19, 1989). The Legislature never intended the SFCA to be an omnibus shield against all wrongdoing by financial institutions. See fn.13 *infra*.

The Complaint adequately alleges the required elements of 'fraudulent inducement' and 'promissory estoppel' at Complaint ¶¶ 74 – 81.

The 'fraudulent inducement' and 'promissory estoppel claims' are not presented in the Complaint as 'predicate' unfair and deceptive trade practices for purposes of the Fowler's CCPA claim. Neglect of Defendant's statutory duties under RESPA, TILA and C.R.S. §38- 40 -101 et. seq. are the only asserted CCPA predicates as indicated in the Complaint. Complaint ¶ 83(a).[24]

The Defendant's conduct toward the Fowlers is extreme and outrageous as a matter of law.[25] Elements of this tort are reviewed in *Trentadue v. U.S.* 386 F.3d 1322 (10th Cir. 2004). Complaint allegations at ¶¶ 91 – 109establish that the Fowlers suffered severe emotional distress as a result of the extended reckless and indifferent manner in which they were treated by BOA in the face of eminent foreclosure of their family home. The Fowler's understandable emotional distress was needlessly and recklessly intensified by: the Defendant's years-long, repeated, multiple failures to respond to hundreds of enquiries as the Fowlers searched for answers and loan modifications. The Defendant's near total neglect of the Fowlers enquiries coupled with verbal disrespect

---

[24] These predicates fall under the 'catch-all' of the CCPA. "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." C.R.S. § 6-1-105(3).

[25] See fn. 19 *infra*.

and abuse hurled at them from Defendant's employees over the phone created anxiety and stress unlike the Fowlers ever experienced. Complaint ¶¶ 91 – 109

In their Motion to Dismiss, Defendants offer no explanation for their prolonged neglect and outrageous behavior. By their Complaint, the Fowlers have met the prima facia burden on their claim for infliction of emotional distress. Allegations of emotional distress arising as a specific result of similar RESPA violations alleged against BOA routinely survive BOA's Motion's to Dismiss in U.S. District courts around the country.[26]

The Defendants acted in deliberate disregard of a high probability that their actions would cause the Fowlers extreme distress. The Fowlers were a family facing immediate financial harm reaching for life-lines and searching for answers in the face of foreclosure. The Defendant's overall treatment of the Fowlers, including: repeated, prolonged nondisclosure of information to which the Fowlers had an absolute right; obstinance and willful procrastination concerning the Fowlers multiple loan applications, and; verbal abuse over the phone amounted to outrageous conduct that "needlessly and

---

[26] Facing a similar Motion to Dismiss by BOA, the Court in *Johnstone v. Bank of America*, 173 F.Supp.2d 809, 815 (N.D.Ill. 2001) wrote:"RESPA allows a plaintiff to recover actual damages for emotional distress for violations of 12 U.S.C. §§ 2605(e)(1) and (e)(2). See also *Rawlings v. Dovenmuehle Mort., Inc.*, 64 F.Supp.2d 1156 (M.D.Ala.1999). In *Rawlings*, the plaintiffs sued the defendants for failing to notify the plaintiffs of their receipt of qualified written requests and for failing to take appropriate action upon those requests. Id. at 1160. The plaintiffs alleged that they suffered mental anguish as a result of the defendants' RESPA violations. Id. at 1164. The court in *Rawlings* first looked to the language of RESPA and its legislative history in determining that Congress intended RESPA to be a remedial consumer protection statute. Id. at 1166. The court then analyzed cases interpreting other consumer protection statutes such as the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA") in concluding that actual damages under RESPA include recovery for mental anguish. Id. at 1166-67. The court finds the analysis of *Rawlings* applicable to this case" ; *Benner v. Bank of America*, 917 F. Supp.2d 338, 364 (E.D.Pa. 2013)( "Defendant also contends that even if its RESPA duties were triggered, Plaintiff has not pled sufficient facts to show he suffered actual damages as a result. The Court again disagrees. Plaintiff alleges he "has suffered fear, anxiety and other emotional distress" as a result of Defendant's actions. The Court finds it reasonable to infer that a borrower in default who repeatedly seeks— yet fails to obtain— information about his financial situation could have damages for mental and emotional suffering. Therefore, the Court will deny Defendant's Motion to Dismiss Count VI of the Amended Complaint." )

recklessly" intensified the family's emotional distress. The Fowler's ordeal has continued for years.

**Defendant's arguments found at "B. The Fowler's Serial Mailings" (pages 5 – 7)**

- *The Fowlers mailings were duplicative.*

- *The Fowlers initially sent their QWR's to addresses not designated for receipt of QWR's and then "copied and re-sent the same correspondence to addresses designated by [BANA].*

- *The Complaint alleges that BANA responded to the Fowlers' written inquiries on at least 86 occasions. Complaint at ¶ 31.*

- *BOA provided the Fowlers with pertinent loan information.*

- *The Fowlers' March 2015 Mailings did not request information related to the servicing of their loan, but instead sought the following: (i) "receipt dates" for the Fowlers' previous mailings (ii) an explanation as to why a BANA representative failed to return Mr. Fowler's phone calls and (iii) information related to the signing of the Fowlers' loan modification.*

- *The Fowlers have not plausibly alleged actual or statutory damages.*

**Plaintiff's Response**

The Fowlers duplicated their initial correspondence when they discovered the Defendant's had designated certain addresses for receipt of correspondence including RFI's, NOE's and QWR's. The Fowlers subsequently sent their written enquiries to the designated addresses. When Defendants failed to timely acknowledge or respond according to statute, the Fowlers reasonably re-sent this correspondence to the designated

addresses.  See Complaint ¶¶ 35 & 36. A loan servicer is *permitted* to "establish a separate and exclusive office and address for the receipt and handling of qualified written requests" from borrowers (24 C.F.R. § 3500.21(e)(1) but is not *required* to do so.[27]

As the Defendants state in their Motion, the Complaint does allege that they responded to the Fowlers' written inquiries on at least 86 occasions however, *none* of their 'form letter' acknowledgments were sent within the 'pre' or 'post' 1/10/14' RESPA statutory time frames required for initial acknowledgments or substantive responses and none of them mentioned which of the Fowler's written enquiries to which each referred. See Complaint ¶ 31.  Failure to timely respond is a RESPA violation. As this Court reviews the Fowler's Complaint exhibits, it is also encouraged to compare the date stamps on Defendant's envelopes (the real dates of mailing) verses the dates printed on the Defendants correspondence.

With one exception, BOA *never* provided the Fowlers with the requested loan and servicing information in a *timely* manner. Complaint ¶ 31. When a consumer raises a written question concerning their account, including questions related to the Home Affordable Modification Program and escrow enquiries, this triggers certain obligations on the part of the bank or servicer. The Fowler's correspondence should have been acknowledged within 5 days and should have been the subject of a substantive responses

---

[27] Benner v. Bank of America,  917 F. Supp.2d 338, 364: [N]owhere in the plain language of 12 U.S.C. § 2605(e) or 24 C.F.R. § 3500.21(e)(1), supra, is a borrower required to send his requests to a loan servicer's specified address; the law simply allows a loan servicer to establish such a place. What is required, though, is that the loan servicer actually receive the borrower's request for information. Here, although Defendant has divisions in Pittsburgh, Simi Valley, and throughout the country, each office is still under the management and control of Defendant.

or affirmative actions in response to the correspondence within 30 days.[28] Under C.R.S. § 38-40-101, BOA had 20 days to respond. Failure to respond per state and federal statute caused the Fowlers additional damage.[29]

The Fowlers' post March 2015 correspondence did request information related to the servicing of their loan but, taking Defendant's argument that they were "not directly related to servicing" as true, direct relation to servicing is of no consequence after January 10, 2014. Effective January 10, 2014 a servicer is required to respond to any written request for information from a borrower that "states the information the borrower is requesting with respect to the borrower's mortgage loan." 12 C.F.R. § 1024.36(a), ('Reg X'). Unlike the earlier version of this regulation that applied to QWR's, the scope of an information request under Reg. X is no longer tied solely to the concept of information "related to the servicing." Rather, requests are effective if they seek any information concerning the borrower's mortgage loan, which include, and are not limited to, the servicing of the loan. Thus, the question as to whether the Fowlers sent valid information requests after March 2015 no longer turns on the definition of "servicing" found in RESPA.[30]

To accommodate the new federal regime in which QWR's continue to co-exist with RFI's, Reg. X provides that a QWR that requests information relating to the

---

[28] The five day/twenty day acknowledgment and response periods under RESPA took effect ('post' 1/10/14). The earlier version of RESPA required acknowledgment within 20 days and a substantive response within 60 days ('pre' 1/10/14).

[29] Itemized damages referenced in Complaint ¶¶ 31 & 67. At minimum, had the Defendants timely responded, the Fowlers would have saved the expense of an additional postage stamp.

[30] See Section-by-Section Analysis, § 1024.36(f)(1)(iv), 78 Fed. Reg. 10,761 (Feb. 14, 2013) ("the final rule . . . does not limit information requests to those related to servicing").

servicing of the mortgage loan is a request for information for purposes and a servicer must comply with all requirements applicable to a request for information with respect to such qualified written request. Reg. X, 12 C.F.R. § 1024.36(a). A written inquiry can be a request for information even if it is not a qualified written request, and so may seek information beyond that of a qualified written request.

The Fowlers' correspondence requesting information related to their loan modification are subject to RESPA and have been treated as a proper QWR's by courts.[31] Such requests are valid because loss mitigation has become a routine function of servicers in the servicing of mortgage loans.[32] In particular, inquiries like the ones made by the Fowlers related to the HAMP qualify, because the only method of obtaining a modification based on the design of the program is through a participating servicer. In fact, Congress has specifically stated that the loan modification analysis required by the HAMP program is the standard of the residential mortgage servicing industry under both federal and state law.[33]

The Fowler's request for the dates of receipt of QWR's, NOE's and RFI's earlier sent qualifies as a RFI. As does their query related to the signing of their loan modification. Complaint Exhibit 39-DTFC-03.

Under state statute, the Defendants had twenty days to respond to information

---

[31] See *Diamond v. One West Bank*, 2010 WL 1742536 (D. Ariz. Apr. 29, 2010).

[32] See also *CW Capital Asset Mgmt., L.L.C. v. Chicago Properties, L.L.C.*, 610 F.3d 497, 500 (7th Cir. 2010) (describing common duties of a servicer of loans in a securitized trust, including "modifying the mortgage to make its terms less onerous to the borrower").

[33] See 'Helping Families Save Their Homes Act' of 2009, Pub. L. No. 111-22, 123 Stat. 1632 (2009) ("The qualified loss mitigation plan guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute standard industry practice for purposes of all Federal and State laws").

concerning the Fowler's loan.[34]


## Defendant's arguments found under "ARGUMENT" (pages 8 - 9)

- BAC Is Not An Appropriate Party.


## Plaintiff's Response

The state equivalent of RESPA defines 'Servicer' as including: "A subsidiary, affiliate, or assignee of a servicer, however designated, … ."[35] Under this definition BAC is an appropriate party because it is the assignee of the original holder/servicer, Countrywide Home Loans, by virtue of merger and acquisition.

¶ 7 of Plaintiff's Complaint reads in part:

> … Defendant BAC Home Loans Servicing, L.P. is/was a servicing company formerly known as Countrywide Home Loan Servicing, L.P.  It was a Texas limited partnership with its principal place of business in Plano, Texas. It was, for a time a wholly owned subsidiary of Bank of America N.A. Countrywide Financial Corporation is/was a financial services company headquartered in Calabasas, California

---

[34] C.R.S. §38-40-103(2) reads:

The servicer of a loan shall respond in writing within twenty days from the receipt of a written request from the debtor or from an agent of the debtor acting pursuant to written authority from the debtor for information concerning the debtor's loan, which is readily available to the servicer from its books and records and which would not constitute the rendering of legal advice. Any such response must include the telephone number of the servicer.

[35] See C.R.S. § 38-40-103.5(e)(II)(B).

with three of its subsidiaries, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, L.L.C. and Countrywide Bank, FSB (collectively, with Countrywide Financial Corporation, "Countrywide"). On April 23, 2009, the Office of the Comptroller of the Currency approved Countrywide Bank, FSB's ("CWB") request to convert its charter back to that of a national bank and the request of Bank of America N.A. to then immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist. Bank of America N.A. was the surviving institution resulting from this merger. Thus Bank of America N.A. is the successor in interest to CWB.

The Fowlers have plausibly alleged, pled and suffered actual and statutory damages at Complaint ¶¶ 38, 39, 40, 41, 53, 54, 56, 66, 67, 68, 71, 72, 73, 80, 81, 89, 100, 101, 108, 109, 110. Damages and causation in this Response are discussed in more detail at pages 30 - 34 *supra*.

**Defendant's arguments found at "B. The Fowlers Fail to State a Viable Claim Under RESPA Because Their Inquiries Were Not Qualified Written Requests And They Cannot Allege Resulting Damages" (pages 9 - 19)"**

- *QWR requirements do not apply to inquiries sent during default.*

- *The Fowlers' March 2015 Mailings were not related to the servicing of their mortgage loan.*

- *The Fowlers' post-May 2015 inquiries were sent after servicing of their loan had been transferred to another servicer.*

- *Regarding the March 2015 mailings, BOA complied with its RESPA obligations because it acknowledged receipt of the mailings within five business days and substantively responded within 30 business days.*

- *BOA was no longer 'servicing' the Fowlers loan after May 16, 2015 because it was no longer responsible for receiving any scheduled periodic payment or applying the payments of principal and interest.*

- *The March mailings did not seek information related to servicing.*

- *The Fowlers have not plausibly alleged damages.*

- *The Fowlers have not adequately pled a direct causal link between BOA's RESPA violations and resulting damages.*

- *The Fowlers do not allege a basis for statutory damages.*

- *The Fowlers do not adequately allege a "pattern or practice" of non-compliance sufficient to support recovery of statutory damages.*

**Plaintiff's Response**

Under the Dodd-Frank Act, rule making authority for RESPA and TILA transferred from the Department of Housing and Urban Authority ('HUD') to the Consumer Financial Protection Bureau ('CFPB') effective 7/21/11.[36] In addition to its new rule promulgating authority, the CFPB was given authority to interpret rules and issue regulations consistent with consumer protection and foreclosure avoidance. On 12/21/11, the CFPB issued the new version of Regulation X ('Reg. X') interpreting

---

[36] Pub.L.No. 111-203, 124 Stat. 1376 §§ 1061, 1098 (July 21, 2010).

RESPA and TILA. See 12 C.F.R. § 1024 (formerly 3500 series). The new Reg. X became effective 1/10/14, changing the interpretation and implementation of RESPA dramatically.

Amendments to Reg. X, establish separate qualifications and procedures depending upon whether a written inquiry is a NOE sent in accordance with § 1024.35 or a RFI sent in accordance with § 1024.36. A QWR that properly asserts an error under § 1024.35 or seeks information under § 1024.36 is considered an NOE or RFI for purposes of these respective regulations.[37] Official interpretations of Reg. X make clear that a QWR is "just one form that a written notice of error or information request may take."[38] Thus, the requirements for compliance with a NOE or RFI apply irrespective of whether a servicer receives what may be interpreted as a QWR. In other words, a written inquiry can be a NOE or RFI even if it is not a QWR. In sum, the qualifying conditions for treatment of written correspondence as a NOE, RFI or QWR under 12 U.S.C. § 2605(e) are easily met.[39] Reg. X §§ 1024.35 and 1024.36 were specifically promulgated to implement 12 U.S.C. § 2605(e).

Regarding NOE's mailed before 1/10/14, courts have not required that QWR's

---

[37] Reg. X, 12 C.F.R. §§ 1024.35(a), 1024.36(a).

[38] CFPB Official Interpretations to Reg. X, ¶ 30(b)-1.

[39] See, e.g., *Jeffries v. Dutton & Dutton, P.C.*, 2006 WL 1343629 (N.D. Ill. May 11, 2006); *Wright v. Litton Loan Servicing, L.P.*, 2006 WL 891030 (E.D. Pa. Apr. 4, 2006) (qualified written request not required to contain name and account number, only information sufficient to identify the account); *Vician v. Wells Fargo Home Mortg.*, 2006 WL 694740 (N.D. Ind. Mar. 16, 2006); *McDonald v. Wash. Mut. Bank*, 2000 U.S. Dist. LEXIS 11496 (N.D. Ill. June 26, 2000) ("§ 2605(e)(1)(B) does not require much for a correspondence to constitute a 'qualified written request'"); *Cortez v. Keystone Bank*, 2000 WL 536666 (E.D. Pa. May 2, 2000); *Rawlings v. Dovenmuehle Mortg., Inc.*, 64 F. Supp. 2d 1156 (M.D. Ala. 1999); *In re Tomasevic*, 275 B.R. 103 (Bankr. M.D. Fla. 2001).

include a detailed explanation of the reasons for the dispute.[40] It has been sufficient for a borrower to generally identify the problem.[41] Effective January 10, 2014, Reg. X § 1024.35 establishes an error resolution procedure that supplements and effectively operates <u>within</u> the existing structure for QWRs. A servicer is required to comply with the requirements under § 1024.35 for any written notice it receives from a borrower that asserts an error covered by the section.[42]

To qualify as a valid borrower inquiry under RESPA, a correspondence must be addressed to a servicer of the mortgage loan and not to other parties related to the loan. RESPA defines a "servicer" to mean "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)."[43]

The term "servicing" is defined to mean "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required

---

[40] *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 687 (7th Cir. 2011) ("Any reasonably stated written request for account information can be a qualified written request. To the extent that a borrower is able to provide reasons for a belief that the account is in error, the borrower should provide them, but any request for information made with sufficient detail is enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond."); Baehl v. Bank of America, 2013 WL 1319635 (S.D. Ind. Mar. 29, 2013) (rejecting as an "untenable result" the servicer's argument that it had no obligation to respond because the borrower had not provided specific reasons for the belief that the account was in error).

[41] See, e.g., *Walton v. Chase Home Fin. L.L.C.*, 2012 WL 6596879 (S.D. Ind. Dec. 18, 2012) (borrower's letter sufficiently identified three disputes with her account, including that servicer had paid from her escrow account premiums for a force-placed insurance policy even though the property was already insured).

[42] Reg. X, 12 C.F.R. § 1024.35(b).

[43] 12 U.S.C. § 2605(i)(2). Note: the state equivalent of RESPA defines 'Servicer' as "a person who collects, receives, or has the right to collect or receive payments on behalf of a holder, … ." See C.R.S. § 38-40-103.5(e).

pursuant to the terms of the loan."[44] The inquiry must be in the form of a written correspondence.[45] A QWR, NOE or RFI must also include the name and account of the borrower, or provide sufficient information to enable the servicer to identify the borrower's name and account.[46] The Fowler's correspondence satisfies this hurdle. Complaint Exhibits 01-2025 through 50-SHON-06. Arguably, a letter containing the borrower's name and property address, without a specific reference to an account number, could enable the servicer to identify the account.[47] The letter does not even need to be signed by the borrower.[48]

Finally, 12 U.S.C. § 2605(e) provides that a written inquiry must be treated as a QWR if it: (1) includes the "reasons for the belief of the borrower, to the extent applicable, that the account is in error," or; (2) "provides sufficient detail to the servicer regarding other information sought by the borrower."[49] While a written inquiry can both

---

[44] 12 U.S.C. § 2605(i)(3). Reg. X clarifies the statutory definition by noting that the "making of payments" of principal and interest and other payments by the servicer from payments received from the borrower is to the "owner of the loan or other third parties." Reg. X, 12 C.F.R. § 1024.2(b). See also CFPB official interpretation of Reg. X.

[45] 12 U.S.C. § 2605(e)(1)(B); Reg. X, 12 C.F.R. §§ 1024.21(a), 1024.21(e)(2) (removed effective Jan. 10, 2014). See, e.g., *Hunter v. Wash. Mut. Bank*, 2008 WL 4206604 (E.D. Tenn. Sept. 10, 2008) (facsimile sent by homeowner listing his name, account number, and reasons he believed servicer was in error may be a qualified written request).

[46] 12 U.S.C. § 2605(e)(1)(B)(i); Reg. X, 12 C.F.R. § 1024.21(e)(2) (vacated and replaced by §§ 1024.35(a), 1024.36(a) effective Jan. 10, 2014).

[47] See *Lee v. Equifirst Corp.*, 2010 WL 4320714 (M.D. Tenn. Oct. 26, 2010) (rejecting servicer argument that letter was not a qualified written request based on failure to include name and account number, noting that borrower obviously included sufficient identifying information because servicer actually responded to the letter); *Kee v. Fifth Third Bank*, 2009 WL 735048 (D. Utah Mar. 18, 2009) (absent evidence showing that servicer was unable to determine who sent letters, letters containing borrower's name and address were sufficient); *Wright v. Litton Loan Servicing*, 2006 WL 891030 (E.D. Pa. Apr. 4, 2006) (statute requires sufficient information to allow servicer to identify the account; the account number is not necessary).

[48] See *Moon v. GMAC Mortg. Corp.*, 2009 WL 3185596 (W.D. Wash. Oct. 2, 2009).

[49] 12 U.S.C. § 2605(e)(1)(B)(ii); Reg. X, 12 C.F.R. § 1024.31(a) (definition of "qualified written request").

dispute a servicer action and seek information, either request alone can be a qualified written request.[50]

Defendant's assertion that QWR requirements under the statute do not apply to borrowers in default is absurd. In discussing the borrowers' right to assert a notice of error for a servicer's failure to provide accurate information to a borrower with respect to available loss mitigation options, the CFPB stated that "it is critical for borrowers to have information regarding available loss mitigation options," and that that this access should include: "accurate information about the loss mitigation options available to the borrower; the requirements for receiving an evaluation for any such loss mitigation option, and; the applicable timelines relating to both the evaluation of the borrower for the loss mitigation options and any potential foreclosure process."[51] The CFPB also noted that servicers are typically required to provide borrowers in default with information about loss mitigation options for loans facing foreclosure. Further, the Defendants signed the National Mortgage Settlement (referenced in Plaintiff's Complaint at ¶88(f)) and servicer participation agreements with the Department of the Treasury which cross reference HUD, Fannie Mae, and Freddie Mac guidelines "providing such information [post default foreclosure options] to borrowers is a standard servicer duty."[52]

---

[50] See *Amini v. . Corp.*, 2012 WL 398636 (W.D. Wash. Feb. 7, 2012); *Luciw v. Bank of America,* 2010 WL 3958715 (N.D. Cal. Oct. 7, 2010) (statute is drafted in the disjunctive so that request for account information alone, without statement that account is in error, is a valid qualified written request); *Goldman v. Aurora Loan Servs., L.L.C.*, 2010 WL 3842308 (N.D. Ga. Sept. 24, 2010) (same); *Rodeback v. Utah Fin.*, 2010 WL 2757243 (D. Utah July 13, 2010) (same); *In re Julien*, 488 B.R. 502, 508 (Bankr. D. Mass. 2013) (unnecessary for debtor who mailed a detailed request for information to "couple these requests with specific assertions of error").

[51] See Section-by-Section Analysis, § 1024.35(b)(7), 78 Fed. Reg. 10,742 (Feb. 14, 2013).

[52] *Id.*

Any pre-January 10, 2014, court opinions cited by the Defendants have dubious precedential value based on the substantial changes made to Reg. X by the 2013 amendments. Although the CFPB retained the statutory definition of 'servicing' in Reg. X § 1024.2, amendments to regulations under Reg. X recognize that 'standard' servicer duties have greatly expanded since the 1990 Servicer Act amendments to RESPA. For example, Subpart C of Reg. X now includes regulations dealing with servicing operations not contemplated by the original definition of "servicing" in RESPA § 2605(i)(3), such as disclosure of the identity of mortgage/note owners, foreclosure avoidance, and loss mitigation. Reg. X also now includes a separate section that describes general servicing policies, procedures, and requirements, based on the CFPB's analysis of servicing industry practices.[53] These significant regulatory changes and developing industry practices must be considered together with the catch-all provision of § 1024.35(b)(11) when determining whether a NOE, RFI or QWR is related to the 'servicing' of a borrower's mortgage loan (and thus subject to RESPA).

Notably, the 2013 amendments to Reg. X also establish post-default loss mitigation activities as a 'standard servicer duty'. In addition, the QWR (and now the RFI and NOE) provisions of RESPA have always qualified under both the old and the new versions/interpretations of RESPA. Congress has specifically stated that the loan modification analysis required by the HAMP program is the standard of the residential mortgage servicing industry under both federal and state law.[54] As the CFPB correctly

---

[53] Reg. X, 12 C.F.R. § 1024.38.

[54] See 'Helping Families Save Their Homes Act' of 2009, Pub. L. No. 111-22, 123 Stat. 1632 (2009) ("The qualified loss mitigation plan guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute standard industry practice for purposes of all Federal and State laws").

noted, "any error related to the servicing of a borrower's mortgage loan also relates to standard servicer duties."[55] It was thus appropriate for NOE's, RFI's and QWR's to be used by the Fowlers to seek information for, and update of, their multiple post-default HAMP applications and to follow up on their multiple improper loan modification denials.[56] The default status of the Fowler's loan was inconsequential to the Defendant's statutory obligation to respond to their written enquiries under the old or new law.

Before 1/10/14, enquiries requesting information related to the status of a loan modification application when a borrower's loan was in default have also been treated as a proper QWR's.[57] One court commented that such requests should be treated as valid because loss mitigation has become a routine function of servicers in the servicing of mortgage loans.[58] In particular, an inquiry related to the HAMP also qualifies, because the only method of obtaining a HAMP modification based on the design of the program is through a participating servicer.

Applying the Defendant's argument that it did not have to comply with RESPA because of the default status of the Fowler's loan (i.e. servicer is no longer "receiving any

---

[55] See Section-by-Section Analysis, § 1024.35(b)(11), 78 Fed. Reg. 10,744 (Feb. 14, 2013).

[56] Nothing in § 1024.35 or its commentary prohibits a borrower from asserting an error under the catch-all provision in section 1024.35(b)(11) based on a servicer's failure to correctly evaluate a loss mitigation application when a loan is in default. In fact, RESPA itself requires servicers, through amendments made by the Dodd-Frank Act, to take timely action to correct errors relating to "avoiding foreclosure," suggesting that borrowers should be able to assert under RESPA errors related to loss mitigation when a loan is in default.

[57] See *Diamond v. One West Bank*, 2010 WL 1742536 (D. Ariz. Apr. 29, 2010); *CW Capital Asset Mgmt., L.L.C. v. Chicago Properties, L.L.C.*, 610 F.3d 497, 500 (7th Cir. 2010) (describing common duties of a servicer of loans in a securitized trust *before* 1/10/14, including "modifying the mortgage to make its terms less onerous to the borrower" [in default]).

[58] See *CW Capital Asset Mgmt., L.L.C. v. Chicago Properties, L.L.C.*, 610 F.3d 497, 500 (7th Cir. 2010) (describing common duties of a servicer of loans in a securitized trust, including "modifying the mortgage to make its terms less onerous to the borrower").

scheduled periodic payments") leads to the absurd result that the remedial Servicer Act provisions of RESPA could not be used by a borrower to avoid a wrongful foreclosure caused by servicer error, simply because the servicer has unilaterally declared the account in default and stopped receiving or accepting payments. Such a construction completely undermines the purpose of the dispute resolution procedure originally intended by 12 U.S.C. § 2605(e) and is inconsistent with the statutory language under the old and new law.[59]

Using inverse analysis on this point, it should be noted that Reg. X expressly provides exemptions from several of the servicer requirements under RESPA when the borrower is in default,[60] but significantly provides no such exemption for QWR response requirements (leading to the presumptive availability of QWR's for use by borrowers in default). It is also worthwhile to note that HUD (as predecessor to the CFPB) had construed the "relating to the servicing" language in 12 U.S.C. § 2605(e)(1)(A) more broadly. When promulgating the specific regulations that implement 12 U.S.C. § 2605(e), HUD rejected comments which sought to narrow the scope of a QWR to inquiries about payments and account balances. HUD stated that "[t]he statute encompasses all information relating to the servicing of a mortgage loan and does not restrict the subject matter to questions concerning the transfer of servicing, installment

---

[59] See *Hammer v. Residential Credit Solutions, Inc.*, 2014 WL 4477948 (N.D. Ill. Sept. 11, 2014) (RESPA applied, despite alleged default, where servicer continued to collect payments after the default); *Henok v. Chase Home Fin., L.L.C.*, 915 F. Supp. 2d 109 (D.D.C. 2013) (letter requesting amount to cure a default is a valid qualified written request); *Tamburri v. Suntrust Mortg., Inc.*, 2011 WL 6294472, at *7 (N.D. Cal. 2011) (letter requesting documentation related to collection and enforcement efforts, including documents in support of enforcement of note, deed of trust and assignments "arguably request[ed] information as to how the servicer has handled [plaintiff's] account"[when in default]).

[60] Examples include duties to: make timely payments out of escrow; send annual escrow account statements etc.

payments, or account balances."[61] The CFPB has since expanded the scope of information requests in the 2013 amendments to Reg. X, clarifying HUD's rule interpretation that *any* information with respect to the borrower's mortgage loan, pre or post default, may be sought, not just information 'related to the servicing of the loan.'

Some of the Fowlers' post-May 2015 inquiries were sent after servicing of their loan had been transferred to another servicer. All of these were 3rd inquires were mailed after the Defendants had ignored the 2nd mailing of the same enquiries mailed to the address designated by the Defendants. The new servicer responded as follows:

| Complaint Exhibit | Date Mailed | 5 Day Acknowledge | 30 Day Substantive Response |
|---|---|---|---|
| 39-DTFC-01 | 3-19-15 | None | None |
| 39-DTFC-02 | 3-19-15 | None | None |
| 39-DTFC-03 | 3-19-15 | Yes | Yes |
| 39-DTFC-04 #2 | 5-28-15 | Yes | None |

The new servicer did not properly integrate the transfer with the Defendants and also violated RESPA. The Defendants were still responsible for responding to the Fowler's second mailing of the same enquiry and both the new and old servicers were responsible for the continuity of servicing transfer.

RESPA's state equivalent is C.R.S. § 38-40-103.5(e)(I) defines 'Servicer' as "a person who collects, receives, *or has the right to collect or receive payments on behalf of a holder*, including payments of principal, interest, escrow amounts, and other amounts due on obligations due and owing to the holder [emphasis added]. At all times herein, BOA had a right to collect or receive payments from the Fowlers.

The Fowlers have plausibly alleged, pled and suffered actual and statutory

---

61 See 59 Fed. Reg. 65,442, 65,445 (Dec. 19, 1994).

damages at Complaint ¶¶ 38, 39, 40, 41, 53, 54, 56, 66,67, 68, 71, 72, 73, 80, 81, 89, 100,

101, 108, 109, 110. Courts have been willing to broadly define the scope of actual

damages available under the statute.[62] Actual damages for Defendant's 12 U.S.C. 2605

violations rightly include all of the Fowler's economic injuries directly flowing from the

Defendant's failure to: respond to the Fowlers QWR's, NOE's and RFI's; make

appropriate corrections to the Fowler's account, and; otherwise comply with RESPA's

requirements including timeliness of acknowledgements and substantive responses.  This

includes expenses that become actual damages for the Fowlers due to the BOA's failure

to adequately respond. Many QWR's, NOE's and RFI's were sent twice once BOA failed

to respond within statutory mandated periods.[63] Components of the Fowler's actual

damages are supported by RESPA case law including:

- ✓ Cost to prepare a notice of error, request for information, or qualified written request;[64]

- ✓ Cost of photocopies and postage in sending a notice of error, request for information, or qualified written request;[65]

---

[62] *Porciello v. Bank of America*, 2015 WL 899942, at *4 (M.D. Fla. Mar. 3, 2015) ("RESPA has been held to be a consumer protection statute, and as such the term 'actual damages' is to be construed broadly").

[63] *Marais v. Chase Home Fin. L.L.C.*, 736 F.3d 711, 721 (6th Cir. 2013) (remanding matter with instructions to district court to consider plaintiff's argument that "those costs [of the qualified written request] were for naught due to defendant's deficient response, i.e., her QWR expenses became actual damages when [the defendant] ignored its statutory duties to adequately respond."); *McMillen v. Resurgent Capital Servs., L.P.*, 2014 WL 3341337, at *3 (S.D. Ohio July 8, 2014) ("Therefore, where the borrower incurs costs as the result of submitting a QWR but effectively receives no benefit, due to a servicer's non-trivial violation of 12 U.S.C. § 2605(e)(2), those costs may become 'actual damages.'").

[64] *Marais v. Chase Home Fin., L.L.C.*, 24 F. Supp. 3d 712 (S.D. Ohio 2014); *McMillen v. Resurgent Capital Servs., L.P.*, 2014 WL 3341337, at *3 (S.D. Ohio July 8, 2014).

[65] *Russell v. Nationstar Mortg., L.L.C.*, 2015 WL 541893 (S.D. Fla. Feb. 10, 2015) (actual damages of photocopying costs and postage costs that were alleged to have been incurred after servicer's response to a qualified written request may be recovered); *Marais v. Chase Home Fin., L.L.C.*, 24 F. Supp. 3d 712 (S.D.

✓ Time spent and expenses incurred in obtaining compliance, transportation costs, and inconvenience;[66]

✓ Additional interest, late fees, and foreclosure costs;[67]

✓ Additional charges resulting from misapplication of payments;[68]

✓ Denial of right to rescind loan by failing it identify note holder;[69]

✓ Rejection of applications for a car loan, credit card and re-finance opportunities;[70]

Ohio 2014) (mailing costs); *Cortez v. Keystone Bank*, 2000 WL 536666 (E.D. Pa. May 2, 2000); *In re Tomasevic*, 273 B.R. 682 (Bankr. M.D. Fla. 2002).

[66] *Marais v. Chase Home Fin. L.L.C.*, 736 F.3d 711 (6th Cir. 2013) (remanding for district court to consider borrower's argument that the expenses she incurred in preparing her qualified written request became actual damages when servicer failed to respond); In re Bryce, 2013 WL 781619 (Bankr. W.D. Wash. Mar. 1, 2013) ($180 paid to borrower's attorney to prepare the qualified written request); *Johnstone v. Bank of America*, 173 F. Supp. 2d 809 (N.D. Ill. 2001); *Cortez v. Keystone Bank*, 2000 WL 536666 (E.D. Pa. May 2, 2000) (actual damages include time spent away from job preparing correspondence to servicer); *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d 1156 (M.D. Ala. 1999) ($75 for "secretarial service correspondence" and $40 for traveling to post office).

[67] *Rizk v. Residential Credit Solutions, Inc.*, 2015 WL 573944 (C.D. Cal. Feb. 10, 2015) (allegation of overpayment of interest); *Gritters v. Ocwen Loan Servicing, L.L.C.*, 2014 WL 7451682 (N.D. Ill. Dec. 31, 2014) (complaint sufficiently pleaded as damages overcharging of taxes and insurance, wrongful assessment of pre-modification charges to post-modification statements, withholding of escrow funds, and the assessment of untimely foreclosure charges); *Enis v. Bank of America.*, 2013 WL 840696 (N.D. Tex. Mar. 7, 2013) (allegation of improper imposition of late fees satisfied pleading requirement for damages under RESPA); *Johnstone v. Bank of America*, 173 F. Supp. 2d 809 (N.D. Ill. 2001); *Padgett v. OneWest Bank*, 2010 WL 1539839 (N.D. W. Va. Apr. 19, 2010) (same); *In re Tomasevic*, 273 B.R. 682 (Bankr. M.D. Fla. 2002) (additional interest caused by servicer's misapplication of chapter 13 plan payments to prepetition arrearage recoverable as actual damages, though debtor failed to prove charges for additional interest).

[68] *Turner v. Ocwen Loan Servicing, L.L.C.*, 2014 WL 6886054 (S.D. Cal. Dec. 3, 2014) (alleging overcharges and late fees resulting from misapplication of payments under forbearance agreement); *Kapsis v. Am. Home Mortg. Serv. Inc.*, 923 F. Supp. 2d 430 (E.D.N.Y. 2013).

[69] *Woods v. Greenpoint Mortg. Funding, Inc.*, 2010 WL 1729711 (E.D. Cal. Apr. 28, 2010) (by failing to give borrower a "straight answer" to request for identity of owner of mortgage, servicer harmed borrower by preventing him from rescinding the loan).

[70] *Rizk v. Residential Credit Solutions, Inc.*, 2015 WL 573944 (C.D. Cal. Feb. 10, 2015) (allegation of reduction in credit limits, increased credit card rates, rejection of car loan, and credit card applications); *Boessenecker v. JPMorgan Chase Bank*, 2013 WL 3856242, at *3 (N.D. Cal. July 24, 2013) (allegation that plaintiffs were not "able to refinance their loan to take advantage of the low interest rates and save thousands per year on their mortgage payments" was sufficient to plead actual damages); *Gray v. Nationstar Mortg., L.L.C.*, 2012 WL 359764 (E.D. Mich. Feb. 2, 2012) (allegations contained in the borrower's affidavit that he was denied an employment opportunity due to negative information in his

and;

✓ Damage to credit rating.[71]

Given the frustration and anguish that the Fowlers experienced in attempting to exercise their rights under RESPA over a period of years, they have plausibly alleged, pled and are entitled to recover damages for emotional distress. Most courts have construed RESPA's actual damages provision to include damages for emotional distress on the basis that RESPA is a remedial consumer protection statute that should be construed liberally.[72] In support of this claim, courts have held that borrowers may also rely upon their own testimony.[73]

---

credit report were sufficient to defeat motion to dismiss); *Hutchinson v. Delaware Sav. Bank*, 410 F. Supp. 2d 374 (D.N.J. 2006) (plaintiffs' allegation that negative credit reports caused them to lose mortgage financing was sufficient to state a RESPA claim).

[71] *Williamson v. Advanta Mortgage Corp.*, 1999 U.S. Dist. LEXIS 16374 (N.D. Ill. Oct. 8, 1999) (damages resulting from inability to refinance mortgage at lower interest rate based on servicer's failure to take corrective action and negative reporting sufficiently pleaded).

[72] *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011)(noting defendant's concession that RESPA allows a plaintiff to recover damages for emotional distress); *McLean v. GMAC Mortg. Corp.*, 398 Fed. Appx. 467 (11th Cir. 2010)(construing the trm 'actual damages' broadly to allow the plaintiff to recover non-pecuniary damages)(unpublished); *Marquette v. Bank of America*, 2015 WL 461852 (S.D. Cal. Feb. 4, 2015) (finding that sufficient facts were alleged demonstrating plaintiff suffered emotional distress); *In re Residential Capital, L.L.C.*, 513 B.R. 446 (Bankr. S.D.N.Y. 2014); *Veloz v. Green Tree Servicing L.L.C.*, 2014 WL 2215866 (D. Ariz. May 29, 2014); *Palmer v. MGC Mortg., Inc.*, 2013 WL 6524648 (E.D. Pa. Dec. 10, 2013); *Blackburn v. BAC Home Loans Servicing, L.P.*, 914 F. Supp. 2d 1316 (M.D. Ga. 2012); *Moore v. Mortg. Elec. Registration Sys., Inc.*, 848 F. Supp. 2d 107 (D.N.H. 2012)("the plain language of RESPA allows a plaintiff to recover actual damages including damages for emotional distress); *Moon v. GMAC Mortg. Corp.*, 2009 WL 3185596 (W.D. Wash. Oct. 2, 2009); *McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360 (S.D. Fla. 2009), aff'd, 398 Fed. Appx. 467 (11th Cir. 2010); *Wright v. Litton Loan Serv. L.P.*, 2006 WL 891030 (E.D. Pa. Apr. 4, 2006) (concluding actual damages include non-economic losses such as suffering and emotional distress and awarding plaintiff $25,000); *Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863 (N.D. Ill. 2002); *Johnstone v. Bank of America*, 173 F. Supp. 2d 809 (N.D. Ill. 2001); *Rawlings v. Dovenmuehle Mortg., Inc.*, 64 F. Supp. 2d 1156 (M.D. Ala. 1999); *In re Thompson*, 350 B.R. 842 (Bankr. E.D. Wis. 2006).

[73] See *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011) (rejecting servicer's argument that borrowers' "self-serving" testimony about their emotional distress was insufficient to support an award of damages); *McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360 (S.D. Fla. 2009) (borrowers may establish causation between RESPA violation and their emotional distress damages through lay testimony; however, court concluded that borrowers' testimony concerning mental distress was insufficient), aff'd, 398 Fed. Appx. 467 (11th Cir. 2010).

The remedy provision in 12 U.S.C. 2605 provides that in addition to actual damages, a court may award "additional" damages in an amount not to exceed $2000 if the evidence reveals a "pattern or practice of noncompliance."[74] As in the case of actual damages, a borrower should be entitled to an award of up to $2000 per violation, not a total award of $2000, for all "pattern and practice" violations.[75] The Dodd-Frank Act amended 12 U.S.C. § 2605(f) to increase the statutory damages to $2000 per violation.[76] Statutory damages under the state statute remain at $1000 per violation.[77]

The Fowlers have adequately pled a direct causal link between BOA's RESPA violations and resulting damages. See Complaint ¶¶ 31, 39, 40, 41, 100, 108 and 110.

The Fowlers adequately allege a basis for statutory damages under RESPA resting upon actual damages sufficiently pled at Complaint ¶¶ 25 - 43.

The Fowlers Complaint adequately alleges and pleads a "pattern or practice" of non-compliance sufficient to support recovery of statutory damages and defeat Defendant's Rule 12(b) Motion. "Pattern and practice" of BOA's non-compliance is established through exhibits attached to the Fowlers Complaint. See Complaint Exhibits Exhibits 01-2025 through 50-SHON-06. Although the statute itself and current case law have not explored the extent of proof that must be presented to satisfy the "pattern and

---

[74] 12 U.S.C. § 2605(f)(1)(B); Reg. X, 12 C.F.R. § 1024.21(f)(1)(i) (removed effective Jan. 10, 2014). Amendments to RESPA section 2605(f) made by section 1463(b) of the Dodd-Frank Act increased the maximum statutory damage amount from $1000 to $2000. Pub. L. No. 111-203, 124 Stat. 1376, tit. XIV, § 1463 (July 21, 2010).

[75] 12 U.S.C. § 2505(f): ("[w]hoever fails to comply with any provision of this section shall be liable to the borrower for **each** such failure" [emphasis added]).

[76] Pub. L. No. 111-203, 124 Stat. 1376, tit. XIV, § 1463 (July 21, 2010).

[77] C.R.S. §38-40-104(1).

practice" requirement under 12 U.S.C. 2605(f)(1)(B), the Court is encouraged to review law containing similar 'pattern and practice' language such as Title VII (involving employment discrimination) and the Home Ownership and Equity Protection Act (HOEPA).

In the context of RESPA, Courts have found a "pattern and practice" for servicers failure to respond to as few as three written RESPA enquiries.[78] One court noted that the "pattern and practice" language in RESPA and other federal statutes is not a "term of art but rather is defined according to the usual meaning of the words," and that it suggests a "standard or routine way of operating."[79] A cursory review of case law involving Bank of America cited in this Response suggests their callous interaction toward the Fowlers is their standard operating procedure with other similarly situated borrowers.

RESPA's state equivalent is C.R.S. § 38-40-103(2) which does not reference any need to demonstrate a "pattern or practice" of non-compliance by the offender.

To survive Defendant's Rule 12(b) Motion, the Fowlers do not need to "allege facts suggesting that BANA engaged in a 'pattern or practice' of violating RESPA that

---

[78] See *Duffin v. Bank of America*, District Court Case No. 2012CV1270 (Jeff.Cnty, Colo. 2012)(Judgment in favor of Plaintiff for failure to respond to three QWR's); *Schneider v. Bank of America*., 2014 WL 2118327 (E.D. Cal. May 21, 2014) (refusing to dismiss claim for statutory damages based on alleged failure to respond to three qualified written requests); *Kapsis v. Am. Home Mortg. Servicing Inc*., 923 F. Supp. 2d 430 (E.D.N.Y. 2013) (allegation of more than two RESPA violations sufficient to survive motion to dismiss);*Mazed v. JP Morgan Chase Bank*, 2014 WL 1364929 (C.D. Cal. Apr. 7, 2014) (borrower's allegations of five instances of sending qualified written requests without a response sufficient to avoid dismissal); *Joern v. Ocwen Loan Serv., L.L.C*., 2010 WL 3516907 (E.D. Wash. Sept. 2, 2010) (finding that three successive failures to timely acknowledge and/or respond to a qualified written request might constitute a pattern or practice); *Serfass v. CIT Group/Consumer Fin., Inc*., 2008 WL 4200356 (D.S.C. Sept. 10, 2008) (pattern and practice of noncompliance established by servicer's failure to respond to five qualified written requests sent by the plaintiff); *Wright v. Litton Loan Serv., L.P*., 2006 WL 891030 (E.D. Pa. Apr. 4, 2006) (awarding statutory damages in view of the numerous violations with respect to the plaintiff). *Ploog v. Homeside Lending, Inc* 209 F. Supp. 2d 863 (N.D. Ill. 2002)(For purposes of ruling on a motion to dismiss, the court concluded that plaintiffs entitled to statutory damages for the servicer's pattern and practice of noncompliance based on the five violations).

[79] *Cortez v. Keystone Bank*, 2000 WL 536666 (E.D. Pa. May 2, 2000).

impacted other borrowers" although they have done so. See Complaint ¶88(b) specifically listing nine other cases in which borrowers have suffered similar conduct at the hands of BOA.

**Defendant's argument found at "C. The Fowlers' TILA Claim Is Barred By the One Year Statue of Limitations (pages 19 - 20)"**

**Plaintiff's Response**

The Fowler's TILA claims (relating to identification of the holder of the note and mortgage) are timely. The Fowlers made a total of 18 requests for identification of the mortgage loan/note holder/owner the last of which was made on 7/3/15. See Complaint ¶48. In addition to TILA having no trigger event from which its statute of limitations ('SOL') begins to run, courts regularly toll the TILA SOL where the violation itself involves concealment)[80]. Examples of circumstances where courts have found sufficient circumstances to raise a question of fraudulent concealment for purposes of tolling the TILA SOL include: a creditor making affirmative misrepresentations at closing and afterwards about the loan terms in question[81], and; a creditor lulling a borrower into a

---

[80] *Bolden v. Aames Funding Corp.*, 2005 WL 948592, at *3 n.5 (W.D. Tenn. Feb 25, 2005)(creditors concealment of its failure to disclose may toll statute of limitations); *Shammami v. IndyMac Fed. Bank*, 2009 WL 3429654 (E.D. Mich. Oct. 21 2009)(where fraud is self-concealing, TILA plaintiff need not allege additional affirmative acts); *Roach v. Option One Mortgage Corp.*, 598 F.Supp.2d 741 (E.D. Va. 2009)(fraudulent concealment may be based upon the acts of concealment involved in the TILA violations itself);

[81] *Galindo v. Financo Fin., Inc.*, 2008 WL 4452344 (N.D.Cal. Oct. 3, 2008)(circumstances justified tolling where defendant made verbal misrepresentations at closing and borrower was illiterate); *Porter v. NationsCredit Consumer Discount Co.*, 2006 WL 851307 (E.D. Pa. Mar.31, 2006)(denying creditors motion for summary judgment and tolling SOL because closing documents and a post-closing post card said that plaintif had not purchased credit insurance), aff'd, 285 Fed. Appx.871 (3d Cir. 2008).

false sense of security by promising to refinance the loan after a period of time.[82] In this case, BOA could not confirm existence of the Note or underlying mortgage on multiple occasions. In several telephone conversations, BOA representatives freely admitted they had no record of ownership of the note or mortgage. Pled at Complaint ¶46.

Finally, even when time barred, TILA claims provide a sufficient predicate offense for unfair and deceptive trade practice claims.[83]

## Defendant's argument found at "D. The Fowlers Have Failed To Plead a Violation of C.R.S. § 38-40-103 (pages 20 - 21)"

- *The Fowlers have not made any written requests.*

- *The Fowlers have not requested any information concerning their loan.*

- *The information requested is not readily available to the servicer.*

- *The Fowlers have failed to plead the existence of any actual damages.*

## Plaintiff's Response

Over a period of years, the Fowlers made 867 written requests concerning their loan. See Complaint Exhibits 01-2025 through 50-SHON-06 #3. While the state statute does not define 'written request,' portions of the state statute refer to 12 U.S.C. 2605[84] indicating legislative intent to mirror the federal statute. The term 'servicer' however, is defined under the state statute more broadly than the federal statute as: "a person who collects, receives, or has the right to collect or receive payments on behalf of a holder,

---

[82] *Wise v. Mortgage Lenders Network USA*, 420 F.Supp.2d 389 (E.D. Pa. 2006).

[83] *In re: Meyer*, 379 B.R. 529, 554 (Bankr. E.D. Pa. 2007)(a TILA violation is an unfair and deceptive trade practice statute violation even if the TILA claim is time barred)

[84] C.R.S. § 38-40-102(1) & (3)

…"; "[t]he person to whom payments are to be sent…", and; "A subsidiary, affiliate, or assignee of a servicer, however designated… ."[85]

In this Response, the Fowlers have previously and adequately responded to Defendant's allegations that somehow their written requests: did not qualify; relate to the servicing of their loan, and/or; concerned information that was not readily available to the servicer. See *infra* pages 21-24 and 28-31.

The Fowlers have also previously and adequately responded to Defendant's allegations that they have failed to plead the existence of damages. See above and also reference Complaint ¶¶ 38, 39, 40, 41, 53, 54, 56, 66, 67, 68, 71, 72, 73, 80, 81, 89, 100, 101, 108, 109, 110.


**Defendant's  argument found at "E.  The Fowlers Remaining Claim Fail For A Host of Reasons(pages 21 - )"**

- *The Fowlers Promissory Estoppel, Fraudulent Inducement, Colorado Consumer Protection Act ('CCPA'), and Outrageous Conduct claims are predicated on their misinterpretation of the May 8th 2012 letter.*

- *The Fowlers Promissory Estoppel, Fraudulent Inducement, CCPA, and Outrageous Conduct claims are each barred by the Credit Agreement Statute of Frauds.*

- *The CCPA claim cannot meet the 'public impact requirement.'*

- *The Fowlers have not alleged that BOA engaged in a deceptive trade practice*

---

[85] See C.R.S. § 38-40-103.5(e)(I), (e)(II)(A) and (e)(II)(B).

*that significantly impacted the public.*

- *The Fowlers have not identified any deceptive trade practice committed by BOA or alleged how any deceptive trade practice is likely to impact borrowers in the future.*

- *No public interest is implicated by allegations that the Defendants are simply engaged in a private wrong against only the Plaintiffs.*

- *Fowlers outrageous conduct claim fails as a matter of law because it is not extreme and outrageous.*

**Plaintiff's Response**

The Complaint is clear that *only* the Fowler's claims of 'Promissory Estoppel' and 'Fraudulent Inducement' are based upon the Defendant's May 8th, 2012 letter. Complaint ¶¶ 74 – 81.

Defendants' argument using the Statute of Frauds for Credit Agreements, ('SFCA')[86], is misplaced. BOA's 5/8/12 letter is clearly *not* a credit agreement as defined by the statute.[87] Cases concerning The Statute of Frauds for Credit Agreements (the "SFCA")

---

[86] C.R.S. § 38-10-124.

[87] C.R.S. 38-10-124(1)(a) reads:

    Credit Agreement means:

    (I)     A contract, promise, undertaking, offer, or commitment to lend, borrow, repay, or forebear repayment of money, to otherwise extend credit or receive credit or to make any other financial accommodation;

    (II)    Any amendment of, cancellation of, waiver of, or substitution for any or all of the term or provisions of any of the credit agreements defined in subparagraphs (I) and (III) of this paragraph (a); and

    (III)   Any representations and warranties made or omissions in connection with the negotiation, execution, administration, or performance of, or collection of sums due under, any of the credit agreements defined in subparagraphs (I) and (II) of this paragraph (a).

involve borrowers seeking to enforce ORAL promises to provide financing, forbearance or other financial accommodation.[88] The Legislature's intent when enacting the SFCA was to "curtail suits against lenders based on oral representations made by members of the credit industry." See *Schoen v. Morris*, 15 P.3d 1094, 1098-99 (Colo. 2000) citing Recordings of the House Business Affairs Committee on H.B. 11-16-1989, 57th General Assembly (Jan. 19, 1989).[89] The Legislature clearly did not intend for the SFCA to exempt financial institutions from statutory claims and tortious wrongdoing.

*Rhino Linings v. Rocky Mountain Rhino Linings,* 62 P.3d 142 (Colo. 2003) recites the elements that must be demonstrated to prove a CCPA cause of action.

---

[88] *Univex Int'l, Inc. v. Orix Credit Alliance, Inc.,* 914 P.2d 1355 (Colo. 1996). (enforcement of ORAL agreement barred by the Statute). *Hewitt v. Pitkin County Bank and Trust Co.,* 931 P.2d 456 (Colo.App. 1995). (tort claims relating to an ORAL credit agreement in excess of $25,000 barred). *Norwest Bank Lakewood v. GCC Partnership,* 886 P.2d 299 (Colo.App. 1994). (barring tort claims based upon alleged ORAL promise to modify terms of a promissory note). *Cavalier Homes of Ala, Inc. v. Sec. Pac. Hous.Serv., Inc.* 5 F.Supp.2d 712 (E.D. Mo. 1997). (barred claim asserting right to enforce ORAL repurchase agreement). *Whirlpool Fin. Corp. v. Sevaux,* 96 F.3d 216 (7th Cir.1996). (barred enforcement of ORAL promise to invest in a corporation and enforcement of oral assurance that obligations under a note would be extinguished by investment). *Lang v. Bank of Durango,* 73 P.3d 1121 (Colo.App. 2003)(barred claims for relief based on ORAL representations made by defendants to the effect that they had verbally agreed to refinance a loan which was subsequently denied). *Premier Farm Credit, PCA v. W-Cattle, LLC,* P.3d 504 (Colo.App. 2006), cert. denied (April 9, 2007). (barred claims relating to enforcement of an ORAL promise to forebear). *Pima Financial Serv. Corp. v. Selby,* 820 P.2d 1124 (Colo.App. 1991). (ORAL settlement agreement discharging obligations barred). Smith v. Hoyer, 697 P.2d 761 (Colo. App. 1984). (damages recovered by borrower based on bank's breach of an ORAL agreement to extend term of loan). *Schoen v. Morris,* 15 P.3d 1094 (Colo.2000). (Statute bars claims which arise from ORAL representations made by bank disallowed).

[89] Representative Kopel, a supporter of the bill, testified during the House Business Affairs Committee Meeting:

> "It's happened in other states and its happened because there is some litigation at a very high level for many millions of dollars where someone has claimed that a statement was made to them by the credit industry, whether finance manager of a bank or whatever, and sometimes courts have used that as a basis for determining yes, there was a contract even though nothing was in writing because other individuals went ahead and relied upon the oral representation."

> Recordings of the House Business Affairs Committee on H.B. 11-16-1989, 57th General Assembly (Jan. 19, 1989).

1. *The defendant engaged in an unfair or deceptive trade practice.* The Fowlers Complaint alleges BOA's chronic neglect of statutory duties under RESPA, TILA and C.R.S. 38- 40 -101 as an unfair trade practice under the CCPA.[90] Complaint ¶ 26. As a preliminary matter, RESPA violations have been recognized by Colorado courts as sufficient predicates for the CCPA[91]. Courts of other states have likewise recognized RESPA violations as sufficient predicates for 'unfair and deceptive trade practice' ('UDAP' = CCPA) claims.[92]

2. *The challenged practice occurred in the course of defendant's business, vocation, or occupation.* The Defendant's are in the business of originating and servicing of loans and, in particular, the Fowlers loan as this term is defined in 12 U.S.C. § 2605(i)(2). See Complaint ¶ 9. The Fowlers Complaint adequately alleges that the Defendant's wrongful conduct occurred during the course of the Defendant's business. See Complaint ¶¶ 21 – 109.

---

[90] C.R.S. §6-1-105(3).

[91] *Perkins v. Johnson*, 551 F.Supp.2d 1246 (D.Colo.2008)(Plaintiff sufficiently stated RESPA claim for relief under the CCPA and 38-40-105 such that outright dismissal is inapplicable). See, e.g., *Whitmer v. Citimortgage, Inc.*, 2012 WL 6677785 (N.D. Ill. Dec. 21, 2012) (denying motion to dismiss UDAP claim based on servicer's alleged failure to take promised actions); *Flikshteyn v. Citimortgage, Inc.*, 2012 WL 10354 (E.D. Mich. Jan. 3, 2012) (borrower stated claim against servicer for deceptive and inaccurate statements made during loan modification attempt); *Okoye v. Bank of N.Y. Mellon*, 2011 WL 3269686 (D. Mass. July 28, 2011) (denying motion to dismiss Chapter 93A claims for misrepresenting that a permanent modification would be approved following successful completion of a Trial Period and for "withholding and changing information, providing pre-textual reasons for denying modification, and making misleading statements regarding the process and the state of the loan" while engaged in negotiations); *Belyea v. Litton Loan Serv., L.L.P.*, 2011 WL 2884964, at *10 (D. Mass. July 15, 2011); *Stagikas v. Saxon Mortg. Serv. Inc.*, 795 F. Supp. 2d 129 (D. Mass. 2011); *Fletcher v. OneWest*, 2011 WL 2648606, at *6–7 (N.D. Ill. June 30, 2011) (allowing claim to proceed); *Marques v. Wells Fargo*, 2011 WL 2005837, at *5 (S.D. Cal. May 23, 2011) (allowing claim to proceed).

[92] *Brazier v. Security Pac. Mortgage Inc.*, 245 F.Supp.2d 1136 (W.D. Wash. 2003)(RESPA requirements are incorporated into state UDAP statute); *Marks v. Ocwen Loan Servicing*, 2007 WL 2409523 (N.D. Cal. Aug. 21, 2007)(denial of motion to dismiss UDAP claim – violation of RESPA's rules is UDAP violation); *Yates v. All American Abstract Co.*, 487 F.Supp. 2d 579)(violation of RESPA rules is UDAP violation); *Munoz v. Int'l Home Capital Corp.*, 2004 WL 3086907, at *11).

3. *The practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property*. The Defendant's conduct against the Fowlers and similar conduct against others have significant public impact. As demonstrated by the case law cited in this Response and the Defendant's signature on the 'National Mortgage Settlement', the Defendant's behavior is widespread and has led to people losing their homes. The Fowlers' complaint and significant number cases identified in this Response involve the Defendant in the same RESPA offense.

Many of the Fowler's written enquires were related to one or more of their 13 HAMP applications. To voluntarily participate in the HAMP program, BOA signed an agreement with the U.S. Department of the Treasury requiring it to solicit the public.[93] Additionally, BOA's website, BankofAmerica.com, solicits the public to enroll in the HAMP.[94] Under Colorado law, mass marketing alone has been enough to meet the impact element of the CCPA.[95] In mass-market mailings, BOA solicited the Fowlers to participate in the HAMP. Complaint Exhibits C: 8-11, 36-40, 47-49, 51-53, 55 and 97. The logo: "Making Home Affordable" is on BOA's mass marketing letterhead referring to its participation in HAMP. BOA's loan modification program impacts a significant number of consumers.[96]

BOA's abuse of the Fowlers and other borrowers meets the 'public impact'

---

[93] A copy of this agreement can be found at www.HMPAdmin.com/portal/programs/HAMP/jsp#2.

[94] In the HAMP Handbook for Servicers of Non-GSE Mortgages and the Servicer Participation Agreement, participating servicers are required to actively solicit borrowers to participate in HAMP before referring a loan to foreclosure or conducting a scheduled foreclosure sale.

[95] *Loughridge v. Goodyear Tire & Rubber Co*., 192 F.Supp.2d 175 (D.Colo. 2002)(manufacturers mass marketing, including a website that targeted ultimate consumers, shows consumer impact);

[96] See Complaint ¶ 88(e) .

element of the CCPA in additional ways. BOA's practices have a 'per se' effect on the public interest because BOA actions violate statutes with specific legislative declarations of 'public interest' impact.[97] Courts have recognized such declarations as satisfying the 'public impact' element of deceptive trade practice statutes.[98] Courts have also held that wrongful behavior breach can involve the public interest if there is 'potential for repetition'.[99] The Fowler's case is one among hundreds holding the Defendants accountable for their violation of RESPA claims. See fn's 1, 3, 17, 19, 20, 26, 27, 40, 50, 62, 66, 67, 76, 78 *infra* and 101, 102 *supra* and see Complaint ¶ 88 listing 9 cases brought against the Defendants for violations of RESPA. BOA's involvement in RESPA litigation with consumers around the nation is legion including class actions.[100] BOA signed a consent judgment in a suit brought by the Attorneys General of 49 states agreeing to refrain from the very behavior that is the subject of this suit.[101] The Court is requested to take judicial notice of this case and consent judgment. See Complaint ¶ 88(f). The sheer volume of litigation against the Defendants involving RESPA violations

[97] See 12 U.S.C. 2601- Congressional findings and purpose (RESPA) and 15 U.S.C. 1601 Congressional findings and purpose (TILA).

[98] *Campbell v. Seattle Engine Rebuilders*, 75 Wash.App. 89, 876 P.2d 948 (1994); *Aubrey's R.V. Center, Inc. v. Tandy Corp.*, 46 Wash.App. 595, 731 P.2d 1124 (1987); *Shah v. Allstate Ins. Co.*, 121 P.3d (Wash.Ct.App. 2005)(violation of insurance code affects public interest). Federal examples of public interest impact include those in RESPA 12 U.S.C. 2601(a) and TILA 15 U.S.C. 1601(a).

[99] *Hangman Ridge Training Stables, Inc. Safeco Title Ins. Co.*, 105 Wash.2d 778, 790, 719 P.2d 531 (1986); Bynum v. Klentak, 1999 Wash.App. LEXIS 76 (Jan. 19, 1999)(misrepresentations and building code violations affect public interest where builder is continuing to build and sell homes).

[100] In addition to hundreds of individual cases brought against BOA, it has settled or is currently involved in multiple class actions for RESPA violations. One example includes: *Voight v. BOA and BAC Home loan Servicing*, U.S. Dist. Ct. Case No. 2:10-cv-02052 (Cent. Dist. Ill. 2010)(class settlement est, between $7.5m and $44m).

[101] See case No. 1:12-cv-00361 (U.S. Dist. Ct, D.C., 2012), commonly known as 'The National Mortgage Settlement', (page 41A, §IX, A. 1.: Servicing standards must be incompliance local, state and federal laws and regulations). Signed by Niel A. Cotty, Chief Accounting officer, Bank of America, N.A.

suggest that "the [D]efendant's challenged practice[s] significantly impacts the public as actual or potential consumers of the [D]efendant's goods, services or property." *Henson v. Bank of America* et.al., 935 F.Supp 2d 1128 (D.Colo. 2013) citing *Hall v. Walter*, 969 P.2d 224, 234 (Colo. 1998). Finally, BOA significantly impacts the public by virtue of its size as one of the world's leading financial institutions.[102]

4. *The plaintiff suffered injury in fact to a legally protected interest*. The Fowlers interest in having the Defendants respond to their written enquiries is legally protected under:  12 U.S.C. 2605(e), Reg. X §§1024.35 and 1024.36; Reg. Z §1026; and C.R.S. §38-40-103.

5. *The challenged practice caused the plaintiff's injury*. The Fowlers adequately alleged damages and causation in their Complaint and have provided receipts for damage in their exhibits. Complaint ¶¶ 38, 39, 40, 41, 53, 54, 56, 66, 67, 68, 71, 72, 73, 80, 81, 89, 100, 101, 108, 109 & 110) (Complaint ¶¶  31, 39, 40, 41, 100, 108 & 110). Complaint Exhibits OS02-OS22 and PO1-PO31 (photocopies of receipts for expenses actually incurred as a result of RESPA violations).

Aside from the verbal abuse and the time wasted by the Fowlers over the phone and administratively, what makes the Defendant's conduct so **outrageous and extreme is** the Defendant's indifference, the time period, the sheer number of written enquires it ignored from the Fowlers.

---

[102] BOA is a multinational banking and financial services corporation and is the second-largest bank holding company in the United States by assets. It serves clients in more than 150 countries and has a relationship with 99% of the U.S. Fortune 500 companies and 83% of the Fortune Global 500. BOA is a member of the Federal Deposit Insurance Corporation (FDIC) and a component of both the S&P 500 Index and the Dow Jones Industrial Average. As of 2010, BOA was the fifth-largest company in the United States by total revenue and in 2010, Forbes listed Bank of America as the 3rd biggest company in the world. BOA is the world's largest wealth management corporation and a holds 12.2% of all bank deposits in the United States.

# IV.    CONCLUSION

For the reasons set forth above, the Plaintiffs have met their FED.R.CIV.P. 12(b)

burden and pray that all causes pled in the Complaint proceed to trial.

dd:    11/29/15                                BULLOCK LAW L.L.C.

*A signed copy of the foregoing is on file and available for inspection at the offices of BULLOCK LAW L.L.C. upon request.*

By:    <u>s/:Tim Bullock</u>
            *Tim Bullock* #35239
            827 Good Hope Drive
            Castle Rock, CO 80108

            (p) 888.682.3788
            (f)303.495.2198

            Bullocklaw@Gmail.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS was e-filed

and served via CM/ECF or U.S. Mail on the following party:

> Adam Lewis
> BRYAN CAVE L.L.P.
> 1700 Lincoln Street, Suite 4100
> Denver, CO 80203

dd: 11/29/15

s/:    *<u>Tim Bullock</u>*
       Tim Bullock